## RAILROAD COMMISSION OF TEXAS ET AL V. METRO BUS LINES, INCORPORATED.

No. A-618. Decided December 5, 1945.
Rehearing overruled January 9, 1946.
(191 S. W., 2d Series, 11.)

In considering the application of a motor bus line to operate upon a public highway which is parallelled by another highway on which another bus line is operating, and which serves the same towns and territory, it is the duty of the Railroad Commission to take into consideration the existing transportation facilities on the latter highway.

*Grover Sellers,* Attorney General, *Eugene N. Catlett* and *Geo. W. Barcus,* Assistants Attorney General, *Cantey, Hanger, McMahon, McKnight & Johnson* and *Fisher T. Denny,* all of *Fort Worth,* for petitioners.

The Court of Civil Appeals erred in holding that there was no evidence to support the order of the Commission. Shupee v. Railroad Commission, 123 Texas 521, 73 S. W. (2d) 505; Northeast Texas Motor Lines v. Texas & Pac. Transport Co., 159 S. W. (2d) 926; Railroad Commission v. Shell Oil Co., 161 S. W. (2d) 1022.

*Donley Suddath,* of Henrietta, *T. S. Christopher, A. B. Culbertson, Culbertson, Morgan, Christopher & Bailey,* all of Fort Worth, for respondent.

The order of the Railroad Commission was unreasonable, unjust and void, and the ruling of the Court of Civil Appeals, so holding was correct. Marrs v. Railroad Commission, 142 Texas, 293, 177 S. W. (2d) 941; Lone Star Gas Co. v. State, 137 Texas 279, 153 S. W. (2d) 681.

MR. JUSTICE SMEDLEY delivered the opinion of the Court.

On August 1, 1941, the Railroad Commission of Texas granted an application for a certificate of convenience and necessity to operate motor buses between Dallas and Arlington over the Jefferson Highway. The certificate, which was assigned to respondent Metro Bus Lines, Inc., prohibited the operator "from picking up passengers at Dallas destined to Arcadia Park, Grand Prairie, Dalworth, Arlington and points west or beyond Arlington, and from picking up passengers at Arlington, destined to Dalworth, Grand Prairie, Arcadia Park, Dallas and points east or beyond Dallas, and from picking up passengers at Grand Prairie destined to Dallas, Arlington, Arcadia Park and Dalworth and to points east or beyond Dallas and to points West of or beyond Arlington, and from performing any service between Dallas, Arcadia Park, Grand Prairie, Dalworth and Arlington; it being the purpose of the certificate to limit the authority granted therein to the local service to or from the national defense plants, factories, fields and bases described in the certificate."

Respondent, continuing to operate, filed with the Commis-

sion, on October 4, 1943, an application for removal of the restrictions contained in the certificate and to extend the service to Dalworthington Gardens, which is southwest of Arlington. The Commission, after the taking of a large volume of testimony, made an order on August 7, 1944, amending the certificate so as to authorize extension of the service to Dalworthington Gardens, but denying the application for removal of the restrictions.

The Commission's order contains elaborate findings made from the evidence. It finds, among other facts, that Jefferson Highway, over which respondent operates .its buses, parellels United States Highway 80, the two highways being separated by approximately 150 feet to 300 feet until Jefferson Highway turns south at Arcadia and enters the City of Dallas; that both highways serve Arlington, Dalworth, various defense plants, Grand Prairie and Arcadia, and both enter the City of Dallas; that while a considerable number of witnesses living in Arlington, Grand Prairie, Dallas. and other points on the route testified that it would be a convenience to them to be able to use respondent's buses into and out of Dallas, the evidence shows that the same territory in which these witnesses reside is also served by Texas Motor Coaches, which uses U. S. Highway 80, and that in most instances it would only be necessary for the witnesses to walk a short distance to catch the buses of the existing carriers. Facts are set out in the order as to the number of buses operated by Texas Motor Coaches between Dallas and Fort Worth, the schedules, the load capacity, the number of passengers carried at various times, the number of vacant seats at times ,the crowded conditions of the buses at "peak hours" and the ability of the Texas Motor Coaches to put on additional schedules and buses. The ultimate finding recited in the order of the Commission is that after considering the existing transportation facilities on United States Highway 80 and Jefferson Highway, the territory between Dallas and Arlington, the service rendered by the existing carriers, and the demand for and need of additional service, the Commission "is of the opinion that there is no public necessity for such service as proposed by the applicant, and that the public convenience would not be promoted by granting the application and removing the restrictions in motor bus certificate number 960."

This action was filed in the district court by respondent, Metro Bus Lines, Inc., against the Railroad Commission, to set aside and cancel the order of the Commission, allegations being made that the order is void as not supported by evidence, is unreasonable, arbitrary and unjust as to respondent, and void for

other reasons. Texas Motor Coaches, Inc., intervened as a defendant. The district court, after trial without a jury, rendered judgment sustaining the Commission's order. The Court of Civil Appeals held that the Commission's order was invalid because unreasonable and unjust, reversed the trial court's judgment, set aside the Commission's order, and adjudged "that the appellant (respondent) be relegated to the Railroad Commission of Texas for appropriate relief not inconsistent with the opinion delivered herein." 188 S. W. (2d) 210.

■ Since the decision of the case depends upon the factual basis, as shown in the trial court, for the order of the Railroad Commission, consideration is required of the often discussed question as to the scope of judicial review of the order of the administrative body. The right of review in this case is given and defined by Section 17 of Chapter 270, Acts Regular Session Fortieth Legislature, being Section 17 of Article 911a, Vernon's Annotated Civil Statutes. The statute provides that if any auto transportation company, association, corporation or other party at interest be "dissatisfied with any decision, rate, charge, rule, order, act or regualtion adopted by the Commission," any such dissatisfied person, corporation, etc., may file a petition, setting forth the particular objection to the decision or order, in the district court of Travis County against the Commission as defendant; that the action "shall be tried and determined as other civil causes in said court"; that either party may appeal to the appellate court; and that "in all trials under this section the burden of proof shall rest upon the plaintiff, who must show by the preponderance of the evidence that the decisions, rates, regulations, rules, orders, classifications, acts or charges complained of are unreasonable and unjust to it or them."

■ The scope of judicial review of the facts under this statute was determined by this Court in Shupee v. Railroad Commission, 123 Texas 521, 73 S. W. (2d) 505, and in two other similar cases decided at the same time, Texas Motor Coaches, Inc., v. Railroad Commission, 123 Texas 517, 73 S. W. (2d) 511, and Texas & Pacific Motor Transport Co. v. Railroad Commission, 124 Texas 126, 73 S. W. (2d) 509. The contention made by the plaintiff in error in the Shupee case was, as set out in the court's opinion: "Shupee contends that the trial court, on the appeal from the order of the Commission, should substitute its own finding based upon a preponderance of the evidence adduced on the trial de novo for that of the Commission." This Court rejected this contention and gave to the statute the construction which is stated in the opinion in the Shupee case as follows:

"We think it clear that the intention of the statutory provisions is that the decisions of the Railroad Commission upon the granting or refusing of any permit to operate a bus line over any highways in Texas should be final and conclusive, unless it acted unreasonably and unlawfully, or unless its decisions had no basis in fact and were arbitrary or capricious. In other words, if the findings and orders of the Railroad Commission in such matters had any reasonable basis in fact, and were not shown to be arbitrary and unreasonable, they must be supported by the court. The court cannot substitute its judgment for that of the Commission, unless it be shown that said judgment of the Commission was without foundation in fact, or was unreasonable or arbitrary."

The plaintiffs in error in the Shupee case and the other two cases above cited were insisting upon an interpretation of Section 17 of Article 911a that would mean a trial in district court in which the court would make its own findings based upon a preponderance of the evidence there adduced. This Court, however, construed the statute as authorizing the more limited scope of judicial review that is defined in the paragraph above quoted from the opinion in the Shupee case.

While the Court's construction may appear to do violence to the language used in Section 17 of Article 911a, it is not without justification. Section 17 does not clearly define the scope of the judicial review; and from its use of general language and the omission of express provision for trial de novo of the questions of fact that have been decided by the Commission, it may fairly be inferred that the legislature intended a review in court other than a full retrial of the facts. 20 Texas Law Review 457, 458.

Further support is found for the Court's construction of the statute in the fact that the statute is one enacted for the regulation of the business of operating motor buses on the public highways. The use of the highways for that purpose is a privilege rather than a right. Ex parte Sterling, 122 Texas 108, 53 S. W. (2d) 294. This being true, orders of the Railroad Commission issuing or declining to issue certificates of convenience and necessity for the operation of motor buses, and other orders of the Commission regulatory of motor bus transportation, are of a nature different from orders or decisions which directly affect property rights. In fields like this, where privileges are granted and the exercise thereof regulated, the administrative authorities, for the sake of efficiency, are usually given greater control, with limited or no judicial review of mere questions of

fact. Volume XXV, American Bar Association Journal, pp. 453, 456-457.

Since the Shupee case was decided the settled rule has been that in suits filed to set aside decisions or orders of the Railroad Commission made under the Motor Bus Statute, Article 911a, a review in court, in so far as the facts which are the basis for the Commission's decision or order are concerned, is confined to the determination from the evidence adduced in court of the question whether the decision or order of the Commission is, or is not, without reasonable foundation in fact. As said in Railroad Commission v. Rapid Transit Co., 92 S. W. (2d) 261, the burden is upon the party attacking the Commission's finding to show that it has "no reasonable factual basis for its support." Another statement, often made, of the same rule is that the court will sustain the finding of the administrative agency if it is reasonably supported by substantial evidence before the court.

The decision made in the Shupee case has never been overruled and we have found no decision of this Court that criticizes or undertakes to qualify it. It was discussed in the opinion in the Lone Star Gas Co. v. State, 137 Texas 279, 306-307, 153 S. W. (2d) 681, and given approval as a correct rule of practice in cases arising under the Motor Bus Act, Article 911a. The Shupee case was cited in Brown v. Humble Oil & Refining Co., 126 Texas 296, 314, 83 S. W. (2d) 935, 87 S. W. (2d) 1069, 99 A. L. R. 1107, 101 A. L. R. 1393. This Court refused applications for writs of error in Keel v. Railroad Commission, 107 S. W. (2d) 439, in which the Court of Civil Appeals cited and followed the Shupee case, and in Highway Transport Co. v. Greyhound Lines, Inc., 124 S. W. (2d) 433, 435, where it was held that in appeals from orders of the Railroad Commission under Article 911a "review is confined to the issues whether the order is within the powers of the Commission and is supported by substantial evidence."

Many decisions by the Courts of Civil Appeals have cited and followed the Shupee case. In Railroad Commission v. Rapid Transit Co., 92 S. W. (2d) 261, the court, after setting out the rule that the burden was upon the appellees to show that the finding of the Commission had no reasonable factual basis for its support, said: "The law upon this question is now so thoroughly settled as to require only a reference to the leading cases thereon." This statement is followed by citation of the Shupee case and a number of decisions of the Courts of Civil Appeals. See also: Railroad Commission v. McDonald, 90 S.

W. (2d) 581; North Texas Coach Co. v. Morten, 92 S. W. (2d) 263; Army Post Bus Lines v. Railroad Commission, 158 S. W. (2d) 872; North East Texas Motor Lines v. Texas & Pacific Motor Transport Co., 159 S. W. (2d) 926; Southland Greyhound Lines v. Railroad Commission, 73 S. W. (2d) 604.

We adhere to the Shupee case for the rule as to the nature and scope of judicial review in actions filed under Section 17 of the Motor Bus Act, Article 911a.

A careful consideration of the opinion of the Court of Civil Appeals, including its statement of the controlling issue presented, its ultimate conclusion, and its judgment reversing the trial court's judgment and annulling the Commission's order, convinces us that the decision of the Court of Civil Appeals was not intended to be or to include a finding as to the sufficiency of the evidence to support the trial court's judgment. On the contrary, the Court of Civil Appeals concluded from its consideration of all of the evidence adduced in the trial court that the Commission's order is without foundation in fact, or is not reasonably supported by substantial evidence, and therefore is unreasonable and unjust and should be set aside as invalid. Having carefully examined the same record, we reach the contrary conclusion, namely, that it is not shown by the evidence that the order of the Commission has no reasonable factual basis for its support.

. The decision of the Court of Civil Appeals rests upon its two conclusions, first, that the evidence affirmatively shows that the Texas & Pacific Railway Company tracks which parallel and separate the two highways from Arlington to a point a short distance east of Grand Prairie, and ditches, creeks and fields between the two highways from that point eastward constitutes serious barriers and work inconvenience to persons residing south of the railroad tracks and near the Jefferson Highway, in their use of the buses of Texas Motor Coaches, which are operated on Highway 80 north of the railroad tracks; and, second, that the evidence affirmatively shows that the intervener Texas Motor Coaches does not and cannot provide passenger service adequate for the public need and convenience.

The trial court made elaborate findings of fact relevant to these two questions. It found that Jefferson Highway, used by respondent, and Highway 80 used by Texas Motor Coaches are substantially parallel all the way from Arlington to the city limits of Dallas, and for the most part are separated only by a short distance, the maximum separation being approximately

three-fourths of a mile at a point which is in the town of Cockrell Hill, directly served by city buses operating into the City of Dallas, and that for a substantial portion of the routes, particularly through the towns of Arlington and Grande Prairie, they are separated only by the width of the Texas & Pacific Railway Company's right of way. The court found that Texas Motor Coaches has for many years served directly the towns and communities of Arlington, Dalworth, Grand Prairie, Arcadia Park, Beverly Hills and the City of Dallas, the route used by its buses running approximately through the middle of the populated areas of the said towns and communities, and in all cases through their principal business sections. It further found that in the towns of Arlington and Grand Prairie there are maintained adequate railroad crossings connecting areas south of the Railway Company's right of way with U. S. Highway 80; that the vast majority of witnesses testifying to the presence of the right of way as a barrier were residents of Arlington and Grand Prairie; and that the railroad right of way is no factor from Grand Prairie eastward, because respondent has the right under its permit to transport passengers from the defense plants and military and naval establishments east of Grand Prairie either in an easterly or westerly direction, and from the defense plants and military and naval establishments eastward the railroad is no factor because it turns north and does not separate the two highways from a point just east of the naval base into Dallas.

Additional findings made by the trial court at respondent's request, which are supplementary and not contradictory of the original findings, show the following facts: that the population of Grand Prairie has increased since 1941 from approximately 1,500 to 15,000 or 25,000; that the territory from Dallas to a point west of Grand Prairie and south of Jefferson Highway has developed to the extent that it is all practically built up with thousands of homes; that from a point east of Grand Prairie eastward the two highways are separated by fields, creeks, gullies and ditches; that much of the right of way of the Texas & Pacific Railroad is fenced and from Grand Prairie for a distance of one and a half miles there is a high "cyclone fence" along the right of way; and that except within the city limits of Dallas and Oak Cliff there are few public thoroughfares between Jefferson Highway and Highway 80, and only two or three crossings over the Texas & Pacific Railroad between the city limits of Dallas and the town of Grand Prairie, and there are four public crossings over the railroad in the town of Grand Prairie and an equal number in the town of Arlington.

We shall state the substance of some of the evidence relating

to the questions of public convenience and necessity. The two highways, Jefferson Highway and Highway 80, are substantially parallel from Arlington to the western limits of the City of Dallas, the total distance between those two points being about fourteen miles. For most of that distance the two highways are separated sometimes merely by the width of the railroad right of way and sometimes by the width of the right of way and from one to three blocks, the greatest separation being about three-fourths of a mile at the town of Cockrell Hill, which is served by city buses operating into the City of Dallas. Respondent's general manager testified that there are twenty-four crossings between the two highways from the city limits of Dallas to the center of the town of Arlington, including streets; that there are eight street crossings over the railroad in Grand Prairie and that between Grand Prairie and Arcadia Park there are four crossings. The maps offered in evidence show several streets, four or five, from one highway to the other in Arcadia Park. The railroad is not a barrier between the two highways farther east than a point a short distance east of the several defense plants, fields and bases near Grand Prairie, where it turns to the north, leaving both highways.

Respondent offered in evidence the testimony of about ninety witnesses whom it describes as "public witnesses." Of these witnesses thirty-five testified to the need of extending the service to Dalworthington Gardens. The application for that extension was granted by the Commission. Of the remaining fifty-five witnesses all but five reside in one of the cities or towns which are served by Texas Motor Coach buses. The five witnesses, who reside on Jefferson Highway and near Arlington or near Grand Prairie, testified that they were compelled to walk a mile or a mile and a half and across the railroad tracks in order to reach Highway 80. Most of the witnesses residing in the towns, twenty-two being residents of Grand Prairie, testified that they were compelled to walk from two to six blocks farther in order to reach the buses on Highway 80 than they would be compelled to walk if they could use respondent's buses on Jefferson Highway. Some of these witnesses testified that respondent's buses would be convenient to them because they passed through a part of Oak Cliff, where they desired to shop. Ten or twelve of the "public witnesses" called by respondent gave no testimony in any way relevant to the questions of convenience and necessity.

Many of the witnesses whose testimony was offered by respondent testified as to the service afforded by the buses operated by Texas Motor Coaches. A number of these witnesses tes-

tified that they were always or nearly always required to stand when they were passengers on the buses, and that the buses were always overcrowded. Several witnesses testified that crowded buses of Texas Motor Coaches, several of them, passed without stopping when they were standing at the stations, and that they were compelled to wait for half an hour or an hour for a bus. A number of respondent's witnesses, some ten or twelve, testified that Texas Motor Company buses had never "passed them up." The tenor of the testimony of most of these witnesses is that at "peak hours," that is in the early morning and early evening, the buses were crowded and many passengers were standing. Several of respondent's witnesses, four or five of them, who used respondent's buses, testified that those buses were overcrowded at "peak hours," particularly at "shift hours," so that many passengers were compelled to stand.

Texas Motor Coaches offered the testimony of many witnesses as to the nature of its service and its ability to provide necessary transportation facilities. Between Dallas and Fort Worth from 5:10 A. M. until midnight it operates sixty-eight schedules, thirty-four each way. On each schedule except at "peakloads" two buses are operated. At "peak loads," which are from 7 to 9 A. M. and from 4:30 to 7 P. M., four buses are operated on each schedule. Both the superintendent of transportation and the president of Texas Motor Coaches testified that the company with its present equipment is able adequately to supply the service necessary for public convenience and necessity over Highway 80 from Arlington to Dallas. The president of the company testified that Texas Motor Coaches has available additional equipment that it can put into service should it be needed.

Texas Motor Coaches has thirty-four bus drivers. Thirty-three of them testified, one being ill. Their testimony is in substance that the buses on one schedule usually stay close together, one being in sight of the other; that the drivers undertake to keep themselves informed as to the load of the other buses on the schedule; that the bus in front sometimes "passes up" passengers when it is crowded and the bus following is not crowded, but that the last bus on the schedule does not "pass up" any passengers; that in "peak hours" the buses are often crowded, with passengers standing; and that usually during the middle of the day there are vacant seats on the buses. The president of Texas Motor Coaches testified that its heaviest traffic is between Grand Prairie and Dallas, and he explained an exhibit, which is in evidence, showing that according to a check for a seven day period in November the load factor in both directions

between Grand Prairie and Dallas was on an average basis 68.78 per cent, with 31.22 per cent of seats vacant.

Whatever might be our judgment if the Court were authorized to weigh the evidence, careful consideration of the evidence in the record, the substance of some of which has been set out herein, convinces us that the Commission's findings that no public necessity exists for the service proposed by respondent and that the public convenience would not be promoted by granting the application for the removal of the restrictions in respondent's certificate, are not without reasonable foundation in fact.

Quoting a recital in the trial court's judgment that makes reference to the record considered by the Railroad Commission as the basis for its order, respondent makes the contention that the trial court erroneously "limited its consideration in reaching its judgment to the sole question of whether there was substantial evidence before the Railroad Commission to support its order." This in our opinion is not a correct construction of the trial court's judgment, for it clearly appears from the whole of the judgment and the findings of fact and conclusions of law that the trial court based its judgment upon the evidence introduced at the trial before the court, including the testimony originally offered in court, and also a transcript of the testimony taken by the Commission which was offered and without objection admitted, to be considered by the court as a part of the evidence in the cause on trial.

Respondent's brief in the Court of Civil Appeals attacks the Commission's order as invalid because predicated in part on an agreement or promise made by Mark Raley, to whom the certificate of convenience and necessity, now owned by respondent, was issued in the year 1941. The trial court heard testimony offered in support of and against this attack made by respondent on the order, the three members of the Railroad Commission testifying at length. After hearing the evidence the court found that the record and the testimony adduced before the Commission's examiner at the hearing held on respondent's application were reviewed and considered by the Commission and its members, and that the record and testimony, and not matters other than the record and testimony, constituted the basis for the order. The evidence at least made an issue of fact for the trial court's determination.

Respondent contends that the Commission, in deciding whether respondent's application should be granted, had no authority to take into consideration the existing transportation facilities afforded by Texas Motor Coaches on Highway 80. This

position emphasizes the use in Sections 3, 6 and 7 of Article 911a of the words "on such highway." Respondent insists that its case was made when it proved that its facilities on Jefferson Highway as restricted did not provide adequate passenger service on that highway, and that nothing further should have been considered by the Commission than the question whether granting the application would promote the public welfare. The three sections of the statute above mentioned do speak of existing facilities on "such highway" and the promotion of public convenience on "such highway," evidently meaning the highway over which the applicant intends to operate buses. Other sections of the statute, however, make reference to the territory involved or to be served. Section 7 provides that the Commission shall have no power to refuse an application for a certificate on the ground that there are existing railroad or interurban railroad transportation facilities sufficient "to serve the transportation needs of the territory involved." Section 8 requires the application for a certificate to be accompanied by a plat showing the route over which the applicant desires to operate and showing also the line or lines of any existing transportation company "over the highways serving such territory." Section 9 directs that notices of the filing of the application shall be mailed to "the owners of existing transportation facilities over the highways serving such territory as applicant seeks to serve."

◼ In view of these provisions of the statute and the facts of this case, in particular the proximity and parallel position of the two highways, and their service of the same towns and for the most part the same territory, it was, in our opinion, the Commission's duty, in acting upon respondent's petition, to take into consideration the existing transportation facilities on Highway 80.

Two points grouped in respondent's brief in the Court of Civil Appeals attack the order of the Commission refusing to remove the restrictions contained in respondent's permit "because these restrictions create discriminations between passengers" and "perpetuate a monoply on behalf of the intervenor." The record does not justify a conclusion that the restrictions in respondent's certificate create unjust discrimination between passengers. Section 7 of Article 911a authorizes the Commission to issue certificates of convenience and necessity "upon such terms and conditions as said Commission may impose." The same section further provides that the Commission "shall have the power and authority to grant temporary certificates to meet emergencies and shall have the power to make special rules and

regulations to meet special conditions in different localities and for such time as in its judgment may be deemed expedient and best for the public welfare." The certificate owned by respondent limited the authority granted therein to "local service to or from the National defense plants, factories, fields and bases described in the certificate." Its issuance carries with it the presumption that the Commission found it to be best for the public welfare that operation under the certificate be thus restricted. The restriction is only as to the places to be served, the carrier being permitted to transport members of the general public as well as employees of the defense plants and men in the service.

■ The refusal of the Commission to remove the restrictions did not have the effect of giving Texas Motor Coaches a monopoly. Section 7 of Article 911a authorizes the Commission to deny the application for a certificate if it determines that the service rendered or capable of being rendered by existing transportation facilities on the highways is reasonably adequate or that public convenience would not be promoted by granting the application. The denial of an application does for a time protect the existing carrier from competition or additional competition, but a permit may be granted to a competitor to operate buses between the same termini or over the same or parallel routes whenever the public convenience and necessity warrant it. Texas Motor Coaches v. Railroad Commission, 41 S. W. (2d) 1074; Southland Greyhound Lines, Inc. v. Railroad Commission, 73 S. W. (2d) 604.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

Opinion delivered December 5, 1945.

Rehearing overruled January 9, 1946.